UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 6:24-CR-00203** |
| **VERSUS** | **JUDGE DAVID C. JOSEPH** |
| **TERRY REBERT, SR.** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

## MEMORANDUM RULING

Before the Court is a MOTION TO SUPPRESS (the "Motion") filed by Defendant Terry Rebert, Sr. (hereinafter, "Defendant") in the above-captioned matter. [Doc. 35]. The government opposes the Motion. [Doc. 46]. On December 14, 2022, Nicholas Hitter, an officer with the Lafayette Police Department ("LPD"), detained the Defendant at the request of another officer on the scene, Cullen Brooks. Officer Hitter's investigatory detention resulted in the seizure of a revolver from the Defendant's pocket. The Defendant was subsequently charged in the above-captioned matter with possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1). A jury trial is set to commence on September 15, 2025.

The Defendant now seeks to exclude the revolver from evidence at trial along with any other "evidence seized and statements made" resulting from this encounter. An evidentiary hearing was held on July 7, 2025, during which the Court heard testimony from two law enforcement officers, Cullen Brooks and Nicholas Hitter, and took evidence, including video footage from the officers' body-worn cameras. For the reasons discussed below, the Motion is DENIED.

## FACTS AND PROCEDURAL BACKGROUND

The factual predicate for Officer Hitter's encounter began a short time earlier on December 14, 2022. An anonymous informant reported to LPD that there was "drug activity" in Room 223 at the Express Inn hotel in Lafayette, Louisiana. *See* [Doc. 63-1]. The informant stated that the room was being used to sell drugs and described the occupants of the room as one Caucasian female and two to three Black males. *See id.* This tip was entered into LPD's computer-aided dispatch ("CAD") system and Officers Brooks and Hitter were dispatched to the Express Inn. Officer Brooks was the first officer on the scene.

Officer Brooks testified that he arrived at the Express Inn in his patrol car and parked on the hotel's southern side. He then left his vehicle and approached the staircase on the western side of the hotel. While walking to the stairway, Officer Brooks observed the Defendant emerge from a hotel room on the second floor and begin walking towards the same staircase that Brooks was approaching. *See* [Doc. 63-1] (notated with an "X"). However, after the Defendant had taken approximately three steps towards the western stairway, he appeared to notice the approaching Officer Brooks. Officer Brooks testified that when the Defendant saw him, he "looked alarmed." The Defendant's eyes "opened with surprise" and he appeared to be "fixated" on Officer Brooks. The Defendant then turned around and began walking in the opposite direction towards the staircase on the other side of the building.

After climbing to the second story of the Express Inn, Officer Brooks approached the hotel room from which Defendant had departed and verified that it was Room 223, the room number provided in the anonymous tip. He then looked through the window of the room and was able to identify three individuals in the room: one Caucasian female and two Black males – again consistent with the information in the anonymous tip. While this was occurring, Officer Hitter had arrived on the scene, parked his patrol unit on the eastern side of the building, *see* [Doc. 63-1] (marked by an "H"), and begun ascending the staircase closest to his vehicle, also on the eastern side of the building.

Immediately after Officer Hitter walked past the Defendant on the eastern staircase, Officer Brooks instructed Officer Hitter to detain the Defendant. *See* [Doc. 62]. Accordingly, Officer Hitter turned around, approached the Defendant, and ordered him to place his hands on his head and spread his legs. *See* [Doc. 62]. Officer Hitter then placed his left hand on the back of Defendant's head to hold his hands in place and used his right hand to remove a firearm from Defendant's right pocket. *See id.* Officer Hitter testified that his seizure of the firearm resulted from him seeing a "bulge" in the Defendant's pocket that he identified as a weapon. Officer Hitter then handcuffed the Defendant and placed him in the back of his patrol car while he sought to identify him and determine if he had a "conceal carry" permit, which Louisiana law required at that time to carry a concealed firearm. Officer Hitter's investigation determined that the Defendant did not have the required permit and had multiple felonies that prohibited him from lawful possession of any firearm.

On September 18, 2024, a federal grand jury returned a one-count Indictment charging the Defendant with a violation of 18 U.S.C. § 922(g)(1) for possessing the subject .22 Cal revolver. [Doc. 1]. After multiple continuances and a change of counsel, the Defendant filed the MOTION TO SUPPRESS [Doc. 35] on June 3, 2025. The Motion argues that the Court should suppress all evidence seized and statements made during the search and seizure of Defendant and his vehicle on December 14, 2022, because his seizure was based solely on an unsubstantiated anonymous tip. [Doc. 35-1]. The government filed a response, [Doc. 46], arguing that Defendant was not detained solely on the basis of the anonymous tip and that the totality of circumstances provided Officer Brooks with reasonable suspicion to direct Officer Hitter to conduct a *Terry* stop of the Defendant. *See Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968).

## LAW AND ANALYSIS

### I. The Fourth Amendment

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST., AMEND IV. A seizure begins when "all the circumstances surrounding the incident" are such that "a reasonable person would have believed that he was not free to leave." *INS v. Delgado*, 466 U.S. 210, 215, 104 S. Ct. 1758, 80 L.Ed.2d 247 (1984) (citation omitted); *United States v. Mask*, 330 F.3d 330, 336 (5th Cir. 2003).

Warrantless searches and seizures are "per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L.Ed.2d 576 (1967) (footnote omitted). The rule of *Terry*, 392 U.S. 1, represents "a very narrow exception." *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014), *citing United States v. Tookes*, 633 F.2d 712, 715 (5th Cir. 1980). To analyze the legality of a stop under *Terry*, the Court must consider whether the officer was justified in the stop at its inception and then examine whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop. *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004).

For a *Terry* stop to be justified at its inception, a police officer must be able to "point to 'specific and articulable facts' that give rise to reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime." *United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017), *citing United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014). "Although 'reasonable suspicion' is more than a 'mere hunch,' it 'need not rise to the level of probable cause.'" *Id.*, *quoting United States v. Zavala*, 541 F.3d 562, 574 (5th Cir. 2008). "To find that reasonable suspicion existed to justify a stop, a court must examine the 'totality of the circumstances' in the situation at hand, in light of the individual officers' own training and experience, and should uphold the stop only if it finds that 'the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing.'" *Id., citing United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L.Ed.2d 740 (2002). "Relevant facts and considerations may include a

description of a suspect, a suspect's location and proximity to known or reported criminal activity, the timeliness of information or the stop, a suspect's behavior, and the officer's experience." *United States v. Brown*, 2023 WL 5602320, at *2 (W.D. Tex. Aug. 29, 2023), *aff'd*, 2025 WL 502082 (5th Cir. Feb. 14, 2025), *citing Illinois*, 528 U.S. 119; *United States v. Vickers*, 540 F.3d 356 (5th Cir. 2008); *United States v. McKinney*, 980 F.3d 485 (5th Cir. 2020); *United States v. Thomas*, 2021 WL 1957412 (5th Cir. May 17, 2021).

## II. Collective Knowledge Doctrine

Under the collective knowledge doctrine, "an officer initiating the stop or conducting the search need not have personal knowledge of the evidence that gave rise to the reasonable suspicion or probable cause, so long as he is acting at the request of those who have the necessary information. In other words, the collective knowledge theory applies so long as there is some degree of communication between the acting officer and the officer who has knowledge of the necessary facts." *United States v. Zuniga*, 860 F.3d 276 (5th Cir. 2017) (citation omitted). There are two types of collective knowledge cases: (i) cases "where the arresting officer has no personal knowledge of any of the facts establishing probable cause, but simply carries out directions to arrest given by another officer who does have probable cause," and (ii) cases where "the arresting officer has personal knowledge of facts which, standing alone, do not establish probable cause but, when added to information known by other officers involved in the investigation, tips the balance in favor of the arrest." *United States v. Wright*, 74 F.4th 722, 731 (5th Cir. 2023).

In the present matter, the government does not allege that any officer other than Officer Brooks had reasonable suspicion to detain Defendant, placing this into the first type of collective knowledge case discussed *supra*. Accordingly, for the Defendant's search and seizure to be found lawful, the Court must determine that Officer Brooks had reasonable suspicion to direct Officer Hitter to detain the Defendant pursuant to *Terry,* 392 U.S. 1.

### III.  Did Officer Brooks have reasonable suspicion to detain Defendant?

There is extensive federal case law regarding when an anonymous tip can provide an officer with reasonable suspicion under *Terry*. In the Fifth Circuit, the "factors that must be considered in deciding whether a tip provides a sufficient basis for a [*Terry*] stop include: (1) the credibility and reliability of the informant, (2) the specificity of the information contained in the tip or report, (3) the extent to which the information in the tip or report can be verified by officers in the field, and (4) whether the tip or report concerns active or recent activity or has instead gone stale." *United States v. Gomez*, 623 F.3d 265 (5th Cir. 2010). But "[a]n anonymous informant's ability to describe a person's appearance and location is insufficient without more to create a reasonable suspicion of criminal activity." *Id.* at 269 (internal quotations omitted).

Here, the government does not allege and the facts do not support a finding that the anonymous tip *alone* was sufficient to give Officer Brooks reasonable suspicion. But the Court determines that the tip still must be taken into account when considering the totality of circumstances. And here the reliability of the tip is bolstered by: (i) the location of the Express Inn in a high drug area, discussed

*infra,* and (ii) the individuals in Room 223 matching the descriptions given in the tip.

In addition to the anonymous tip, the government highlights several other "factors that ordinarily constitute innocent behavior [but which] may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers." *United States v. Jacquinot,* 258 F.3d 423, 427-28 (5th Cir. 2001); *see also United States v. Daniel,* 982 F.2d 146, 150 (5th Cir. 1993) ("[W]hile any one of these factors standing alone might not provide reasonable suspicion, an aggregate of factors passes muster under the *Terry* doctrine."). In this vein, the government points to the following: (i) Defendant's strange and evasive conduct in a high drug area, *citing Illinois v. Wardlow*, 528 U.S. 119 (2000); (ii) Defendant's proximity and possible connection to the hotel room, *citing Adams v. Williams*, 407 U.S. 145-46 (1972); and (iii) the risk of officer safety because individuals involved in drug activity often carry weapons. [Doc. 46, p. 7].

At the suppression hearing, the Court heard testimony that the Express Inn hotel is in a high crime area and well known to law enforcement as a hotspot for drug-related activity. Specifically, Officer Brooks testified that in the 12-month period leading up to the incident, there were 871 calls for police service at the Express Inn – averaging more than two every day. He further testified that he had personally arrested five individuals at the Express Inn within the three-month period prior to the incident. As explained by the Supreme Court, "the fact that [a] stop occurred in a 'high crime area'" is "among the relevant contextual considerations in a *Terry* analysis." *Illinois,* 528 U.S. 119. "That is especially true

when a high[] crime area is combined with other suspicious behavior." *Wright*, 74 F.4th at 732. But an "[i]ndividual's presence in area of expected criminal activity, standing alone, is not enough to support reasonable, particularized suspicion that person is committing a crime." *Illinois*, 528 U.S. 119. Here, the detention occurred at a hotel well known by law enforcement as a high crime area after the LPD had received an anonymous tip indicating drug activity at the specific room from which the Defendant emerged. These two factors weigh in favor of finding reasonable suspicion under the totality of circumstances analysis. *See e.g. United States v. Roper*, 63 F.4th 473, 478-79 (5th Cir. 2023) (finding the defendant's location in an area of expected criminal activity contributed to a finding of reasonable suspicion).

Next, the government points to Defendant's evasive and suspicious behavior, which it categorizes as "flight." "[Supreme Court] cases have [] recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois,* 528 U.S. 119. But the Fifth Circuit has "never held that nervousness alone is sufficient to create reasonable suspicion of criminal activity." *United States v. Portillo–Aguirre*, 311 F.3d 647, 656 n.49 (5th Cir. 2002). Rather, "[t]he context in which a person seeks to avoid contact with a peace officer is important. Reasonable suspicion may arise when an individual flees from police in a high[] crime area … [or] when the officers are already patrolling the area in response to a specific report of criminal activity[.]" *Monsivais, supra,* 848 F.3d 353, 360-61, *citing United States v. Tuggle*, 284 F. App'x 218, 225-26 (5th Cir. 2008). But "the defendant does not have to run away for his behavior to be considered

unprovoked flight." *Tuggle*, 284 F. App'x at 255, *citing United States v. Gordon*, 231 F.3d 750, 757 (11th Cir.2000) ("Obviously the speed of the suspect's movements may be relevant in the totality of the circumstances, but the fact that the suspect walked very quickly, as opposed to ran, away from the spot where he was sighted by police does not itself change the analysis where it is evident from the circumstances that he was attempting to flee upon sighting the police.").

Here, Officer Brooks observed the Defendant leaving the same hotel room described in the anonymous tip. And Officer Brooks testified that it is common for hotel rooms to be used to conduct drug transactions. As such, although the Defendant did not match the anonymous informant's description of any of the occupants of the hotel room, it would have been reasonable for Officer Brooks to believe that the Defendant might have gone to the hotel room to purchase drugs.

Officer Brooks also testified that after exiting the hotel room, the Defendant abruptly changed his behavior after noticing his approach – turning and walking in the opposite direction. While it is apparent that Defendant walked, rather than ran, away from Officer Brooks, it is more important to the Court's analysis that the Defendant changed direction as soon as he saw Officer Brooks. See *Tuggle*, 284 F. App'x at 255. And, as discussed above, this evasive action occurred at a high crime hotel after the Defendant had emerged from the very room that law enforcement was sent to investigate for potential drug activity. *Monsivais*, 848 F.3d at 360-61. Therefore, the Defendant's behavior likewise supports a finding of reasonable suspicion under a totality of the circumstances analysis.

Lastly, the government argues that officer safety supported detention because officers are aware that individuals involved in drug activity often carry weapons. [Doc. 46, p. 7]. "An officer need not be certain that an individual is armed; the issue is whether a reasonably prudent man could believe, based on 'specific and articulable facts,' that his safety or that of others is in danger." *United States v. Gooden*, 2000 WL 1092856, at *4 (E.D. La. Aug. 2, 2000). Federal courts have acknowledged the danger and high likelihood of guns in relation to drug activity. *See e.g. United States v. Lomax,* 293 F.3d 701, 705 (4th Cir. 2002) (acknowledging the "numerous ways in which a firearm might further or advance drug trafficking"). And Officer Brooks testified that based on his experience, he was aware at the time of the incident that narcotics investigations are inherently dangerous. Accordingly, because the officers were in a high crime area, investigating an anonymous tip about drug activity, it was reasonable for them to believe there was an imminent safety risk.

Considering the foregoing, the Court finds that the "composite picture" was "sufficient to raise reasonable suspicion" for the investigatory stop in the mind of Officer Brooks. *Scott*, 733 F. Supp. 3d 535. *See e.g. United States v. Bolden*, 508 F.3d 204, 207 (5th Cir. 2007) (finding reasonable suspicion because of "the timing and location [of] the Jeep[], its 'relatively fast pace,' and the nearly contemporaneous warning that [the officer] received that the shooters were around the corner"); *Illinois,* 528 U.S. 119 (defendant's unprovoked flight from officers in area of heavy narcotics trafficking supported officer's reasonable suspicion); *Wright*, 74 F.4th at 732 ("If there were any doubt about the tip's reliability, however, it is

important to remember that the tip was not the only basis for the *Terry* stop. There was a second factor supporting reasonable suspicion: The area was known for the precise type of criminal activity alleged in the tip."). Therefore, pursuant to the collective knowledge doctrine, Officer Hitter legally detained Defendant at Officer Brooks' direction. *Wright*, 74 F.4th at 731.

### IV. Was the search of Defendant permissible under *Terry*?

When an officer has reasonable suspicion pursuant to *Terry*, "he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." *Terry, supra,* 392 U.S. 1.

Here, given the facts recited above and considering the totality of the circumstances, the Court concludes that Officer Hitter possessed reasonable suspicion to believe Defendant was armed and dangerous, justifying Officer Hitter's removal of the firearm from Defendant's pocket and subsequent patdown. These circumstances included: (i) the nature of the anonymous tip; (ii) the high crime location of the Express Inn; (iii) the well-recognized connection between narcotics and firearms; and (iv) the observed bulge in Defendant's pocket. *See Pennsylvania v. Mimms,* 434 U.S. 106, 112, 98 S. Ct. 330, 334, 54 L. Ed. 2d 331 (1977) ("The bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer."); *United States v. Scott*, 2020 WL 1030927, at *9 (E.D. La. Mar. 3, 2020) ("Numerous courts have concluded that an individual's suspected involvement in drug transactions can support reasonable suspicion to conduct a patdown of the individual for weapons.");

*United States v. Rideau*, 969 F.2d 1572, 1575 (5th Cir. 1992) ("Rideau's specific moves took place after a detention, at night, in a *high crime area where the carrying of weapons is common.* These are articulable facts upon which a police officer may legitimately rely in justifying his actions.") (emphasis added).

V. **Defendant's Statements**

Because the Court finds Officer Hitter's December 14, 2022, search and seizure of the Defendant to be lawful, any resulting statements or physical evidence obtained by law enforcement are not subject to suppression under the fruit of the poisonous tree doctrine. *See United States v. Jaquez*, 421 F.3d 338 (5th Cir. 2005) ("Under the 'fruit of the poisonous tree' doctrine, all evidence derived from the exploitation of *illegal search or seizure* must be suppressed") (emphasis added). Nor does the record contain argument or evidence of a violation of the Defendant's rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966). *See United States v. Lim*, 897 F.3d 673 (5th Cir. 2018) ("*Miranda* warnings must be administered prior to custodial interrogation."); *United States v. Rider*, 94 F.4th 445, 454 n.16 (5th Cir. 2024) (Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."). Indeed, the only statement referenced at the hearing – Defendant stating that he "just found" the firearm – was a spontaneous statement made by the Defendant to which *Miranda* does not apply.[1] *United States v. Ruiz*, 427 F. App'x 323, 324 (5th Cir. 2011).

---

[1] While the body-worn camera footage of Officer Hitter asking Defendant for his name and date of birth once Defendant was placed in his patrol car was not presented at the

**CONCLUSION**

For the foregoing reasons, the Court DENIES Defendant's MOTION TO SUPPRESS [Doc. 35].

THUS, DONE AND SIGNED in Chambers on this 9th day of July 2025.

_____
DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE

---

hearing, the Court highlights that this statement falls outside the scope of *Miranda* regardless. *See Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.,* 542 U.S. 177, 191, 124 S. Ct. 2451, 2461, 159 L.Ed.2d 292 (2004) ("The principles of *Terry* permit a State to require a suspect to disclose his name in the course of a *Terry* stop."); *United States v. Romo-De La Rosa,* 463 F. App'x 239 (5th Cir. 2012) ("There is no evidence the officer knew — or grounds for contending she should have known — that her requests for [the defendant's] name and date of birth were 'reasonably likely to elicit an incriminating response.'").